## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**ALICE R. CASTO,**

     **Plaintiff,**

**v.**                        **Case No.: 2:15-cv-14729**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 14, 15).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 14); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF

1

No. 15); and **DISMISS** this action from the docket of the Court.

## I.   Procedural History

On February 8, 2011, Plaintiff Alice R. Casto ("Claimant") protectively filed an application for DIB, alleging a disability onset date of December 1, 2010 due to multiple endocrine neoplasia, osteopenia, hypercalcemia, GERD, depression, diabetes, blood clots, and varicose veins. (Tr. at 251-58, 325). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 126-36, 138-44). Claimant subsequently filed a request for an administrative hearing. (Tr. at 145-46). An initial hearing was held on July 13, 2012 before the Honorable James P. Toschi, Administrative Law Judge ("ALJ Toschi"). (Tr. at 69-96). ALJ Toschi issued a decision determining that Claimant was not disabled as defined in the Social Security Act. (Tr. at 14). However, the Appeals Council remanded the case for further consideration due to the fact that ALJ Toschi's decision was based upon a date last insured of December 31, 2010, rather than the correct date of December 31, 2011. (*Id.*). Therefore, a second administrative hearing was held on April 29, 2014 before the Honorable H. Munday, Administrative Law Judge ("the ALJ"). (Tr. at 33-68). By written decision dated June 6, 2014, the ALJ likewise found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-32). The ALJ's decision became the final decision of the Commissioner on September 14, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No.

14), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 15), to which Claimant filed a reply. (ECF No. 16). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 54 years old on her alleged disability onset date and 55 years old on her date last insured. (Tr. at 251). She communicates in English and completed one year of college, as well as obtained a cosmetology degree. (Tr. at 324,326). Claimant previously worked as a master instructor at a beauty school. (Tr. at 326).

## III.    Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's

impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2011. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 1, 2010, her alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "multiple endocrine neoplasia type 1 (MEN-1), history of deep vein thrombosis (DVT), and mild lumbar facet arthropathy." (Tr. at 16-18, Finding No. 3). The ALJ considered and found non-severe Claimant's diabetes mellitus, varicose veins, osteopenia, chronic obstructive pulmonary disease ("COPD"), major depressive disorder, post-traumatic stress disorder ("PTSD"), and bipolar disorder. (Tr. at 17).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 18-19, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could perform occasional balancing, stooping, crouching and climbing of ramps and stairs, but never kneel, never crawl, and never climb ladders, ropes, or scaffolds. She could have no exposure to hazardous conditions including unprotected heights and moving machinery.

(Tr. at 19-25, Finding No. 5). At the fourth step, the ALJ found that through the date last insured, Claimant was capable of performing her past relevant work as a "master instructor/technical instructor/administrative assistant." (Tr. at 25-26, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 27, Finding No. 7).

## IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises two challenges to the Commissioner's decision. First, Claimant contends that the ALJ's assessment of Claimant's credibility is insufficient under SSR 96-7p[1] and 20 C.F.R. § 404.1529 because the ALJ does not provide reasons for her credibility findings that are sufficiently specific to make clear the weight that the ALJ gave to Claimant's statements and the reasons for that weight. (ECF No. 14 at 13). On this point, Claimant argues that the ALJ's credibility assessment contains boilerplate language

---

[1] The SSA recently provided guidance for evaluating a claimant's report of symptoms in the form of SSR 16-3p. In doing so, the SSA rescinded SSR 96-7p, 1996 WL 374186, which Claimant relied on in her brief. The undersigned finds it appropriate to consider Claimant's first challenge under the more recent Ruling as it "is a clarification of, rather than a change to, existing law." *Matula v. Colvin*, No. 14 C 7679, 2016 WL 2899267, at *7 n.2 (N.D. Ill. May 17, 2016); *see also Morris v. Colvin*, No. 14-CV-689, 2016 WL 3085427, at *8 n.7 (W.D.N.Y. June 2, 2016).

without any actual analysis of Claimant's allegations and testimony. (ECF No. 16 at 3).

In her second challenge, Claimant asserts that the ALJ's step two finding that Claimant's mental impairments were non-severe was not based on substantial evidence as Claimant's records showed more than *de minimis* mental impairments that impacted her work activities. (ECF No. 14 at 14). Claimant contends that the ALJ failed to discuss or consider any of the psychologists' opinions. (*Id.*). Further, Claimant argues that the ALJ "cherry pick[ed]" information from the report of consultative psychologist, Cynthia Spaulding, M.A., contrary to Ms. Spaulding's overall findings and the other record evidence, including the psychological opinions and Claimant's statements. (*Id.* at 15). In addition, Claimant argues that to the extent that the ALJ relied on the opinions of the non-examining state agency psychologists, her reliance was misplaced because neither psychologist had the benefit of reviewing Ms. Spaulding's report and the agency consultants were operating under the assumption that Claimant's date last insured was December 31, 2010, not December 31, 2011. (ECF No. 16 at 3).

In response to Claimant's challenges, the Commissioner maintains that Claimant has not proven that she is disabled under the Act. (ECF No. 15 at 13). Regarding the credibility assessment, the Commissioner argues that the ALJ specifically stated that she considered the factors enumerated in 20 C.F.R. § 404.1529(c) and SSR 96-7p, and she was not required to specifically discuss each factor. (ECF No. 15 at 16-17). Moreover, the Commissioner argues that the ALJ's decision demonstrates sufficient development of the record and explanation of findings to permit meaningful review. (*Id.* at 17). Lastly, the Commissioner argues that the ALJ's credibility determination is supported by substantial evidence, pointing to the ALJ's analysis of Claimant's lack of mental health treatment, her daily activities, and the opinion evidence. (*Id.* at 18-20).

7

Regarding the ALJ's finding that Claimant's mental impairments were non-severe, the Commissioner identifies the fact that the ALJ applied the special technique outlined in 20 C.F.R. § 404.1520a and determined that Claimant had only "mild" restrictions in the first three functional areas and "none" in the fourth areas; thus, the Commissioner argues that the ALJ permissibly determined that Claimant does not have a severe mental impairment. (*Id.* at 13-14). The Commissioner also asserts that the ALJ's determination is supported by the opinions of the non-examining state agency psychologists. (*Id.* at 15). The Commissioner argues that Claimant's reliance on Ms. Spaulding's opinion and Claimant's own statements is unconvincing as the ALJ explained that Ms. Spaulding's opinion was inconsistent with the other evidence and Claimant's statements were not credible. (*Id.* at 15-16). Overall, the Commissioner argues that Claimant is asking the court to re-weigh the evidence, which is improper. (*Id.* at 16).

## V.   <u>Relevant Medical History</u>

The undersigned has reviewed all of the evidence before the Court. The medical records and opinion evidence most relevant to this PF & R are summarized as follows.

### A. Treatment Records

On August 9, 2010, Claimant presented to the office of her primary care provider, Richard E. Cain, M.D., for a regular follow-up appointment. (Tr. at 464-65). She reported generally doing well, although she was having some gastrointestinal symptoms. (Tr. at 464). She continued to have low back pain, but her radicular left leg pain was better. Claimant had no psychiatric symptoms. Dr. Cain assessed Claimant with stable hyperlipidemia, low back pain, MEN-1 syndrome, and reflux symptoms. Dr. Cain scheduled Claimant for an endoscopy, ordered blood work and a CT scan to check the MEN-1 syndrome, and provided her with stretching exercises for her back. (*Id.*). A CT

scan of Claimant's abdomen and pelvis taken later in August showed multiple non-obstructing kidney stones, a benign cyst of the kidney, cholelithiasis, and diffuse fatty infiltration of the liver. (Tr. at 454). Claimant also underwent a colonoscopy and esophagogastroduodenoscopy on October 13, 2010, which revealed internal hemorrhoids and a rectal polyp, but were otherwise unremarkable. (Tr. at 442).

Claimant returned for a regularly scheduled visit with Dr. Cain on October 26, 2010. (Tr. at 462-63). Once again, Claimant reported doing well, although she was experiencing increased stress due to family health concerns. (Tr. at 462). Nonetheless, Dr. Cain felt that Claimant was psychologically stable. He assessed her with hyperlipidemia, stable reflux, stable MEN-1, and vitamin D deficiency. For Claimant's insomnia and stress, Dr. Cain decided to keep Claimant on Citalopram (brand name—Celexa). (*Id.*). She was instructed to return in two to three months.

On February 22, 2011, Claimant saw Dr. Cain for regular follow-up. (Tr. at 460). She was doing "o.k." in general, but reported hurting all over, including joint and muscle pains, and experiencing trouble at work and having to cut back on her hours. (*Id.*). She was stable psychologically and her review of systems and physical examination were normal. (*Id.*). Dr. Cain questioned if Claimant's hyperlipidemia medications were causing her muscle soreness. (*Id.*). Claimant was also assessed to have stable reflux, an unspecified syndrome relating to her abdomen and pelvis, myalgias, vitamin D deficiency, and low back pain. (*Id.*). Claimant was given prescriptions for Vicodin and Robaxin to try for her low back pain. (*Id.*). Dr. Cain planned to see Claimant again in two to three months. (*Id.*).

On April 12, 2011, Claimant saw Dr. Cain for right ear pain and flu-like symptoms. (Tr. at 459). Her review of systems was otherwise stable, but she stated that she still had

some right-sided abdominal and flank pain. (*Id.*). She was diagnosed with otitis and an upper respiratory infection. (*Id.*). Claimant was noted to be stable psychologically, but was given a referral to "Dr. Kathy Karr for depression." (*Id.*).

On April 16, 2011, Claimant pursued testing ordered by Dr. Cain relating to her complaints of headaches and left-sided abdominal pain and a history of kidney stones. A MRI of Claimant's brain was unremarkable. (Tr. at 432). A CT scan of her abdomen and pelvis showed chronic scarring and non-obstructing calcification in the inferior pole of the left kidney, a 4.2 cm right renal cyst without significant change, cholelithiasis without evidence of cholecystitis, and fatty infiltration of the liver. (Tr. at 433).

On April 27, 2011, Claimant had another regular follow-up appointment with Dr. Cain. (Tr. at 458). She reported that her left flank pain was gone, but she still had some left-sided pain anteriorly under the ribs, which was not meal related. (*Id.*). She also reported increasing stress and irritability. (*Id.*). The review of her systems and physical examination were normal. (*Id.*). Her hyperlipidemia, esophageal reflux, palpitations, and MEN-2 syndrome[2] were noted to be stable. (*Id.*). Her low back pain was improved, although she reported that she still had some symptoms and pain when sitting; she was instructed to continue performing stretching exercises. (*Id.*). Regarding her left flank pain, the CT scan showed a non-infected kidney; therefore, Dr. Cain planned to continue to monitor the issue. As far as her depressive disorder, Claimant reported mood swings and irritability, but no suicidal or homicidal thoughts. (*Id.*). Dr. Cain increased her dose of Citalopram from 20 mg to 40 mg and stated that he would schedule her to see a

---

[2] Claimant was diagnosed with MEN-1 via genetic testing. (Tr. at 633). MEN-1 is characterized by the presence of benign and sometimes malignant tumors of the parathyroid, pancreas, and pituitary, lipomas (benign skin tumors consisting of fat), facial angiofibromas, and sometimes other signs.  (Tr. at 852). It is unclear why this record references MEN-2.

counselor. (*Id.*). Dr. Cain also noted that Claimant reported that her friends were concerned that she was bipolar, but he did not think she had the typical symptoms of that condition and would monitor it. (*Id.*). Overall, Dr. Cain planned to see Claimant in a month unless she had problems prior to her next appointment. (*Id.*).

On May 23, 2011, Claimant saw Dr. Cain for follow-up. (Tr. at 531). She still had left flank pain, but was feeling much better. (*Id.*). Her osteoarthritis and MEN-1 syndrome were stable. (*Id.*).  She also had some asthma and allergy symptoms that were improved with Singular. (*Id.*). Dr. Cain planned to see Claimant again in four months. (*Id.*).

On November 7, 2011, Claimant presented to Dr. Cain after noticing a lump on her right axilla. (Tr. at 528). She reported "working up a deer" the day prior. (*Id.*). She stated that her right flank pain was still present and severe at times, but she otherwise had stable arthritic symptoms. (*Id.*). Dr. Cain's impression was that Claimant suffered from hyperlipidemia for which she was to get follow-up blood work; a new right shoulder soft tissue mass, which could possibly be a cyst or muscle irritation for which she was to get an ultrasound; and right flank pain. (*Id.*).

On November 12, 2011, Claimant presented for an ultrasound of the palpable mass in her right shoulder. (Tr. at 515). The ultrasound showed a nonvascular well-circumscribed mass that was most likely a lipoma.[3] (*Id.*). Regarding Claimant's complaint of abdominal pain, an ultrasound showed cholelithiasis without evidence of cholecystitis, a 5.4 cm simple right renal cyst that had increased in size, and diffuse fatty infiltration of the liver. (Tr. at 516-17).

---

[3] A lipoma is a benign tumor consisting of mature fat cells. Mosby's Medical Dictionary, 9th edition. © 2009, Elsevier.

On November 22, 2011, Claimant followed up with Dr. Cain. (Tr. at 527). She reported that she was doing "about the same;" she still had left flank pain and some reflux symptoms. (*Id.*). The lipoma on her right shoulder was improved and not causing pain at the time of her appointment. (*Id.*). Claimant still had headaches, which she attributed to sinus issues and stress. (*Id.*). Her right renal cyst was larger, but not causing pain. (*Id.*). Her asthma was improved with Singular. (*Id.*). Dr. Cain documented that Claimant's left flank pain was of undetermined etiology, as her ultrasound and CT scan were normal; he questioned if it was musculoskeletal. (*Id.*). Finally, Dr. Cain noted that he would continue to monitor Claimant's MEN-1 syndrome. (*Id.*). Dr. Cain planned to see Claimant again in two to three months. (*Id.*).

### B.  Evaluation and Opinion Evidence

On March 16, 2011, Fulvio Franyutti, M.D., completed a physical RFC form. (Tr. at 397-404). Dr. Franyutti opined that Claimant was capable of light work with additional postural and environmental limitations (Tr. at 398-99, 401). He found Claimant to be partially credible, noting that as far as activities of daily living, Claimant reported being unable to move without pain, unable to do housework due to pain, had problems with all areas of abilities, and could not walk far without stopping to rest. (Tr. at 404). However, Claimant also had no problems with personal care, prepared small meals, drove, went out alone, and shopped in stores. (*Id.*).

On the same date, Philip E. Comer, Ph.D., completed a Psychiatric Review Technique form.[4] (Tr. at 414-27). Dr. Comer concluded that Claimant had non-severe depression related to a general medical condition. (Tr. at 414, 417). He rated her with only

---

[4] This assessment was only for the period of December 1, 2010 through December 31, 2010.

mild restriction in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. at 424). Further, Claimant had no episodes of decompensation of extended duration and no evidence of "paragraph C" criteria. (Tr. at 424-25).

Dr. Comer noted that Dr. Cain's records reflected a past history of depression, but no current diagnosis or treatment for depression. (Tr. at 426). As far as activities of daily living, Dr. Comer stated that Claimant reported sleeping a lot and not being able to do housework due to pain, as well as having no hobbies, trouble getting along with others, problems in all areas of abilities, a history of being fired for "cussing people out," and fearing death. (*Id.*). However, as noted by Dr. Franyutti, Claimant also had no problems with personal care, prepared small meals, drove, went out alone, shopped once a week, and spent time with her family. (*Id.*). Dr. Comer concluded that Claimant's statements were reasonably consistent with the other evidence in her file and were credible from her perspective; however, Dr. Comer stated that Claimant appeared to have the mental/emotional capacity for work-like activity in a work environment that could accommodate her physical limitations. (*Id.*).

On April 13, 2011, Jeff Boggess, Ph.D., reviewed the relevant evidence and affirmed Dr. Comer's psychiatric assessment. (Tr. at 428). Dr. Boggess did not review any evidence in addition to the file that Dr. Comer reviewed. (*Id.*). On the same date, Caroline Williams, M.D., affirmed Dr. Franyutti's prior assessment, noting that there was no new medical evidence in the file; Claimant alleged no change in conditions; no new illnesses, injuries, or limitations; and no change in pain medications. (Tr. at 430).

On June 1, 2011, licensed psychologist Cynthia Spaulding, M.A., performed a consultative evaluation of Claimant. (Tr. at 478-87). Claimant complained of excessive

13

sleeping; apathy; mood changes; short term memory issues; and flashbacks about childhood trauma. (Tr. at 478). She also reported that all of her family members suffer from MEN-1 like her and she watched her mother, brother, and nephew suffer before their death. (*Id.*). She was observed to cry while explaining the family history regarding MEN-1, and she also expressed guilt for passing the illness to her children, although her mother was the first person diagnosed with the disorder. (*Id.*). Ms. Spaulding documented that Claimant had not received any mental health treatment, noting that Dr. Cain referred Claimant for mental health treatment, but the clinician did not accept her insurance. (Tr. at 479).

Claimant reported to Ms. Spaulding that she had been diagnosed with MEN-1 fifteen years earlier and stated that she suffered from low calcium which affected her short term memory, frequent headaches lasting for days at a time, and back pain. (*Id.*). Claimant reported working primarily as a cosmetologist at a beauty school, but stated that she currently only performed filing at that job because she could not remember how to cut hair. (Tr. at 480). Claimant's full scale IQ was assessed to be 88 on the Wechsler Adult Intelligence Scale for Adults – Fourth Addition ("WAIS–IV") and the results were deemed to be valid. (Tr. at 480-81). Claimant was oriented, alert, and she exhibited normal affect, eye contact, and speech, but her mood was noted as depressed. (Tr. at 482). Her immediate and remote memory were within normal limits, but her recent memory was severely impaired as evidenced by her ability to recall 1 out of 4 previously presented words after 5 minutes. (*Id.*). Her judgment and persistence were normal, but her attention and concentration were moderately impaired based on her score of 6 on the Digit Span Subtest of the WAIS–IV. (*Id.*). Claimant displayed appropriate social skills and eye contact, but she was very emotional during the assessment. (*Id.*). She reported working

20 hours per week, although she set her own hours depending on how she was feeling and sometimes could not work at all. (*Id.*). She stated that she recently attended a baby shower; however, she reported that she did not participate in social activities during the winter and was no longer attending religious services. (*Id.*).

During a typical day, Claimant stated that she drank water, showered, made the bed, cooked for her husband, did laundry, cleaned, and took care of her dogs and birds. (*Id.*). She also reported sleeping 12 to 14 hours per day. (*Id.*). Ms. Spaulding diagnosed Claimant with recurrent, severe major depressive disorder without psychotic features and secondary PTSD. (*Id.*). The diagnosis of depression was based upon the fact that Claimant was crying during the evaluation and the fact that she reported excessive sleeping, irritability, hopelessness, guilt, withdrawal, and intermittent suicidal ideations. (Tr. at 483). The diagnosis of PTSD was based on Claimant's history of traumas and her current symptoms of flashbacks, affective instability, hyper vigilant behavior, and nightmares. (*Id.*).

Overall, Ms. Spaulding opined that Claimant had no restriction in understanding and remembering simple instructions, but mild restriction in carrying out simple instructions and making judgments on simple work-related decisions. (Tr. at 484). Claimant was moderately limited in understanding and remembering complex instructions and markedly limited in carrying out complex instructions and making decisions on complex work-related instructions. (*Id.*). In support, Ms. Spaulding stated that Claimant had mood disturbances and post-traumatic stress, which affected her memory and judgment. (*Id.*). Further, Claimant had mild restriction in interacting appropriately with the public, supervisors, and co-workers, and was moderately impaired in responding to usual work situations and changes in routine work settings. (Tr. at 485).

15

On these points, Ms. Spaulding noted that Claimant's major depressive disorder and PTSD affected her ability to interact with others and her emotions quickly changed from one minute to the next. (*Id.*).

On June 7, 2011, Claimant was evaluated by Sushil M. Sethi, M.D., M.P.H., F.A.C.S. for the West Virginia Disability Determination Service. (Tr. at 488-99). Claimant reported that her MEN-1 syndrome was well stabilized, although she had periodic stomach upset and diarrhea; she had no changes in weight, blood transfusions, or inpatient treatment due to the condition. (Tr. at 488). Her diabetes was well-controlled without medication, her varicose veins were stable, and she had no recurrence of blood clots. (Tr. at 488-89). Dr. Sethi stated that Claimant's osteopenia was probably related to menopause and was treated with calcium and vitamins. (Tr. at 489).

Regarding depression, Claimant reported to Dr. Sethi that she suffered from the condition most of her life, but it "came to the surface" when her mother died 15 years prior. (*Id.*). Her depression was "pretty well stabilized" and she was not currently receiving any counseling or treatment; her family doctor periodically gave her medications for depression. (*Id.*). Claimant reported working 40 hours a month. (*Id.*). On physical examination, Claimant's review of systems was normal. (*Id.*). She had no edema or cyanosis in her lower extremities and no inflammation. (*Id.*). Her gait was normal and her straight leg raising test was 80 degrees on both sides. (Tr. at 490). She had moderate tenderness in her lumbar spine. (*Id.*). Dr. Sethi's impression was that Claimant had MEN, a history of parathyroidectomy, osteoporosis, hypercalcemia, gastric reflux, situational depression, and diet-controlled diabetes without medication or complications. (*Id.*). Her ability to work at physical activities was moderately limited, but her ability to hear, speak, and travel were normal. (*Id.*).

Dr. Sethi opined that Claimant could continuously lift up to 20 pounds and carry up to 10 pounds, frequently lift up to 50 pounds and carry up to 20 pounds, and occasionally lift up to 100 pounds and carry up to 50 pounds. (Tr. at 493). She could sit for 6 hours in an 8-hour workday and stand and/or walk for 4 hours; however, she could only sit for 4 hours and stand and/or walk for 3 hours at one time without interruption. (Tr. at 494). She could frequently use both hands and feet, meaning up to two-thirds of the day. (Tr. at 495). She could frequently perform all postural activities and frequently tolerate environmental conditions. (Tr. at 496-97).

During Claimant's first administrative hearing on July 13, 2012, Judith Brendemuehl, M.D., testified regarding Claimant's physical impairments. Dr. Brendemuehl testified that Claimant had MEN-1 diagnosed through genetic testing, although Claimant was asymptomatic. (Tr. at 74-75). Claimant had three parathyroids removed on December 17, 2002, well before the alleged onset of disability, and all testing was normal since then and her disease remained inactive. (Tr. at 75-76). Claimant had DVT, which was resolved in her right leg and resolving in her left leg. (Tr. at 76). Claimant could perform light work with postural and environmental limitations. (Tr. at 77-79).

Psychologist C. David Blair, Ph.D., also testified during the hearing. Dr. Blair stated that Claimant had no psychiatric treatment other than treatment with Celexa by Dr. Cain. (Tr. at 79). Dr. Blair noted that Claimant complained of flashbacks during her consultative exam with Ms. Spaulding, but that complaint did not appear anywhere else in the record. (Tr. at 79). Dr. Blair questioned Claimant's statement that she could not remember how to cut hair because that would involve her long term memory and something very severe would have to happen to interfere with that type of memory. (Tr. at 80). Dr. Blair noted that the tests which Ms. Spaulding performed, especially those involving arithmetic,

required a lot of memory; Claimant received average arithmetic and coding scores and a high average symbol search score, so her performance indicated that her short term memory was "working okay." (Tr. at 80). Dr. Blair did not feel that Ms. Spaulding provided enough information to show that Claimant's test results were valid. (Tr. at 81). He also disagreed that Claimant's attention and concentration were moderately impaired, and disagreed that Claimant had PTSD. (Tr. at 82-83). Dr. Blair found no indication of functional operational memory problems or any mental limitations. (Tr. at 83-85). Dr. Blair concluded that the record did not support a diagnosis of mental issues other than possible dysphoria and adjustment issues relating to Claimant's physical condition. (Tr. at 84).

On July 16, 2012, Claimant's husband, Stephan L. Casto, wrote a letter to Claimant's non-attorney representative. (Tr. at 371). In that letter, Mr. Casto stated that he had been present when Claimant vomits profusely when her "acid medicine is out of adjustment" and "when she spends days on the couch complaining that 'her bones hurt.'" (*Id.*). He further stated that Claimant was in constant pain, which was managed most of the time with drugs, and that she also had memory loss. (*Id.*).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  **Discussion**

### A. *The ALJ's Credibility Analysis*

Claimant contends that the ALJ's decision does not provide specific reasons for the ALJ's assessment of Claimant's credibility. (ECF No. 14 at 13). She argues that the decision contains boilerplate language without any actual analysis of Claimant's allegations and testimony. (ECF No. 16 at 3). The undersigned disagrees with Claimant's contention for the following reasons.

Pursuant to 20 C.F.R. § 404.1529, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016).

Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In

*Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that

'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ performed the two-step process. First, the ALJ thoroughly discussed Claimant's alleged symptoms and statements regarding her abilities and activities,

22

including Claimant's purported issues with lifting, standing, walking, and sitting, as well as her alleged memory impairment, excessive sleeping, depression, and social problems. (Tr. at 19-20). However, the ALJ noted some inconsistencies in Claimant's statements such as her testimony that she had trouble using her hands and arms, but she helped "put up" a deer in November 2011. (Tr. at 20); *see* SSR 16-3p, 2016 WL 1119029, at *8 (the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities.). The ALJ further stated that Claimant "confusingly" reported that she did not take any medications for her depression after she took one sample anti-depressant from her doctor and could not function for three days; however, she also testified that she was on Celexa since 2000 or 2001. (*Id.*). In addition, the ALJ pointed out that when Claimant was questioned what her limiting factors were during the relevant time frame, she responded: "I don't know," stating that she was in pain, but she did not know if it was depression or genetics. (*Id.*).

Ultimately, the ALJ concluded that while Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Tr. at 20-21). The ALJ noted that the objective findings, treatment notes, and findings on physical examinations did not support disabling limitations; further, the ALJ cited that Claimant made statements throughout the course of treatment, which demonstrated that she was not as limited as alleged. (Tr. at 21).

The ALJ's performed an exhaustive discussion of the medical evidence in her decision. The ALJ considered not only Claimant's treatment records within the relevant period of December 1, 2010 through December 31, 2011, but the ALJ also thoroughly

discussed her analysis of Claimant's treatment record which preceded and followed that period. Regarding Claimant's allegations of depression, the ALJ noted that Claimant was referred to a counselor, but never pursued treatment. Claimant suggested her lack of psychological care was due to a lack of insurance; however, Claimant's husband undermined that assertion by reporting that he provided her with health insurance. (Tr. at 21). Further, the ALJ noted that Claimant did not consistently complain of mental health issues during the twelve-month period prior to her date last insured. As an example, the ALJ referenced Dr. Cain's office note in February 2011 in which he documented that Claimant was stable psychologically. (*Id.*).

Regarding Claimant's physical complaints, the ALJ acknowledged that Claimant had a history of DVT, but emphasized that Claimant was placed on an anticoagulant, Coumadin, without complications. Moreover, her subsequent records reflected that she was stable, feeling much better, and was even noted as "very active." (Tr. at 21-22). As for Claimant's MEN-1 syndrome, the ALJ indicated that prior to Claimant's alleged onset date, an esophagogastroduodenoscopy (EGD) showed internal hemorrhoids and a rectal polyp, but was otherwise unremarkable. (Tr. at 21). Further, the ALJ cited that following Claimant's date last insured, her MEN-1 was described as stable. (Tr. at 22). Regarding back pain, the ALJ noted that Claimant reported in the month before her alleged onset date that she was "doing okay" and her low back pain radicular symptoms were improved. (Tr. at 21). The ALJ acknowledged that within the relevant time frame, in February 2011, Claimant was given prescriptions to "try" for back pain, although Claimant presented in no acute distress. (Tr. at 22). However, the ALJ identified that in April 2011, Claimant's low back pain was improved and continued to be improved following her date last insured. (*Id.*). Overall, the ALJ concluded from her analysis of the evidence that

Claimant's conditions were treated conservatively and well-controlled with only medications prescribed by her primary care physician. (Tr. at 23-24).

In addition to the medical evidence, the ALJ considered Claimant's activities of daily living in assessing her credibility. The ALJ noted that "while Claimant has attempted to minimize her activities of daily living, there is no basis for this in the record." (Tr. at 23). The ALJ highlighted Claimant's testimony that she drove to visit her grandchildren and helped feed them, as well as a medical record prepared after Claimant's date last insured stating that she was "very active." (Tr. at 24). Further, the ALJ examined Claimant's statements during her consultative examination that she attended a baby shower; regularly cleaned and cared for her pets; did laundry, made beds, and cooked for her husband; and worked 20 hours per week. (*Id.*). The ALJ was clear that she found Claimant's activities of daily living to reflect a higher level of functioning than alleged by Claimant. (Tr. at 24, 25). In addition, the ALJ found that the record revealed no adverse side effects from treatment or medication that would prevent Claimant from performing competitive work on a regular and continuous basis. (Tr. at 23).

In evaluating Claimant's reported symptoms and limitations, the ALJ also considered and weighed the available opinion evidence.[5] She afforded great weight to the opinions of the non-examining state agency physicians who found that Claimant was limited to light level work with additional postural limitations, finding that the opinions were generally consistent with the evidence of record. (Tr. at 23). The ALJ also agreed with the state agency psychologists' assessments that Claimant did not have any disabling mental conditions and was only mildly functionally limited due to mental impairments.

---

[5] Claimant does challenge the weight that the ALJ assigned to the opinion evidence.

The ALJ further considered the opinions of the examining experts. The ALJ noted Ms. Spaulding's finding that Claimant had marked and moderate mental limitations; however, the ALJ ultimately decided to assign Ms. Spaulding's opinions no weight on the basis that the opinions were inconsistent with the other medical evidence. (Tr. at 24). Specifically, the ALJ pointed to the fact that Claimant's treatment records showed that her conditions were under good control with only medication prescribed by her primary care physician, her activities of daily living indicated a higher level of functioning than she alleged, and Claimant never pursued any formal mental health treatment or counseling. (*Id.*).

The ALJ evaluated the opinion of Dr. Sethi from his consultative physical examination, but only gave Dr. Sethi's opinions partial weight as the ALJ found that Claimant's severe impairments, as evidenced by objective findings, physical examination, and activities of daily living established that Claimant was more limited than Dr. Sethi found. (Tr. at 24). The ALJ also considered the written statement of Claimant's husband, which provided that Claimant was in constant pain that was most of the time managed with drugs, and that she experienced memory loss. (*Id.*). However, the ALJ gave no weight to this statement as Claimant's husband was inherently an interested party in the outcome of the claim and his statement was inconsistent with Claimant's reported activities of daily living. (*Id.*).

In addition, the ALJ reviewed Dr. Brendemuehl's testimony from Claimant's July 2012 administrative hearing, which included the opinion that Claimant was capable of light work with some postural limitations and a restriction to avoid heights and hazardous machinery. (Tr. at 24). The ALJ gave Dr. Brendemuehl's opinion great weight, concluding that it was consistent with the treatment records indicating that Claimant was stable prior

to the date last insured, the unremarkable findings on physical examination, and activities of daily living. (Tr. at 24-25). The ALJ also reviewed and gave great weight to Dr. Blair's testimony from the same administrative hearing, in which he opined that Claimant did not have a mental limitation or even a psychological diagnosis. The ALJ found that such testimony was consistent with the other evidence, including the fact that Claimant's conditions were controlled with conservative treatment requiring only medication prescribed by her primary care provider and without formal mental health care. (Tr. at 25). Finally, the ALJ discussed the prior determinations by ALJ Toschi and stated that she gave his decision great weight, noting that Claimant had not produced additional evidence after ALJ Toschi's decision that established a finding of disability prior to the date last insured. (*Id.*). The ALJ concluded that Claimant's collective record, objective evidence, treatment notes, physical and mental examinations, and her activities of daily living discussed throughout the ALJ's decision demonstrated that Claimant's impairments were not disabling. (*Id.*). Therefore, the ALJ determined that Claimant's subjective complaints and alleged limitations were not fully persuasive in light of the other evidence of record.

Claimant alleges that the ALJ focused only on objective evidence, discounting Claimant's statements without analysis. (ECF No. 14 at 13). This argument is without merit. The ALJ contrasted Claimant's allegations not only with the objective evidence, but also with Claimant's own contradictory statements, her activities of daily living, and the numerous sources of opinion evidence. The ALJ was explicitly clear in her decision that Claimant's allegations of disabling symptoms were belied by all of the evidence, including her conservative treatment, well-controlled conditions, lack of formal mental health treatment, lack of adverse side effects, activities of daily living, and the non-examining

expert opinions. (Tr. at 19-25). Furthermore, as stated by the ALJ, there is no medical source statement indicating that Claimant was disabled during the relevant period. (Tr. at 25). The ALJ was not required to discuss each factor described in 20 C.F.R. § 404.1529(c) or SSR 16-3p; instead, the ALJ was obliged to supply logical reasons grounded in substantial evidence to support the weight that she assigned to Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms. *See Bailey*, 2015 WL 9595499, at *19; *Murdock v. Colvin*, No. 5:14CV40, 2014 WL 9866441, at *3 (W.D.N.C. Nov. 19, 2014). Ultimately, the ALJ did just that.

It is not the province of this court to "re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner." *Hays*, 907 F.2d at 1456. In this case, the undersigned finds substantial support for the ALJ's credibility analysis. Claimant's treatment records during the relevant period fail to support Claimant's allegations regarding the intensity, persistence, and severity of her symptoms. As noted by the ALJ, Claimant was treated conservatively and her conditions were well-controlled with only medications prescribed by her primary care provider, Dr. Cain. Claimant's treatment consisted of regularly scheduled follow-up appointments with Dr. Cain, other than a few visits when she presented with flu-like symptoms, or noticed a lipoma in her shoulder, or when she went in for testing ordered by Dr. Cain. (Tr. at 432, 458-60, 515, 527-28, 531). Claimant had no hospitalizations or emergency room visits and her records fail to reflect any concerns which were severe enough for her to present to Dr. Cain other than as indicated. (*Id.*).

Overall, there is substantial support for the ALJ's finding that Claimant's records failed to support the degree of symptoms and limitations alleged. During the relevant

period, Claimant often reported flank and/or abdominal pain, but her ultrasounds and CT scans showed no changes and Dr. Cain stated that the source of the pain was of undetermined etiology. (Tr. at 433, 516-17, 527). Claimant also complained of low back pain in February 2011, but it is not documented in her succeeding records until April 27, 2011 when she stated that it was improved, although she still had some symptoms and pain when sitting. (Tr. at 458-60). Claimant's MEN-1, reflux, and arthritis were either not mentioned or indicated to be stable with the exception of "some reflux symptoms" in November 2011. (Tr. at 432, 458, 460, 527, 531). Claimant reported "hurting all over," including joint and muscle pains in February 2011, but she did not mention those symptoms again. (Tr. at 432, 458-60, 515, 527-28, 531). No issues were noted regarding Claimant's hyperlipidemia. (*Id.*). Claimant complained of headaches on only a couple of occasions and attributed them to sinus issues or stress; also, the MRI of her brain was unremarkable. (Tr. at 432, 527). Finally, regarding Claimant's alleged mental impairments, Claimant complained of depression on only a couple of occasions during the relevant period and was treated conservatively by Dr. Cain; as the ALJ noted to be significant, Claimant never sought formal mental health treatment.

Not only is the ALJ's analysis of the treatment record supported by substantial evidence, but the ALJ analyzed the various statements made by Claimant, all of the expert opinions, Claimant's daily activities, and the prior decision in Claimant's case. The ALJ provided a well-supported analysis for the weight that she assigned to each piece of evidence. For all of the reasons discussed above, the undersigned **FINDS** that the ALJ's decision complies with 20 C.F.R. § 404.1529 and SSR 16-3p and is supported by substantial evidence.

### B. The ALJ's Step Two Finding that Claimant's Mental Impairments Were Non-Severe

In her second challenge, Claimant asserts that the ALJ's step two finding that Claimant's mental impairments were non-severe was not based on substantial evidence as Claimant's records showed more than *de minimis* mental impairments that impacted her work activities. (ECF No. 14 at 14). Claimant contends that the ALJ failed to discuss or consider any of the psychologists' opinions; "cherry pick[ed]" information from consultative psychologist Ms. Spaulding's report; and, to the extent that the ALJ relied on the opinions of the state agency psychologists, her reliance was misplaced because neither of them had the benefit of reviewing Ms. Spaulding's report and were operating under the assumption that Claimant's date last insured was December 31, 2010. (*Id.* at 14-15; ECF No. 16 at 3).

At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §§ 404.1521(a), 416.921(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, remembering simple instructions, understanding simple instructions, carrying out simple instructions, using judgment, interacting appropriately with co-workers, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b),

416.921(b). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003).

The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

Here, the ALJ found that Claimant alleged, or the record reflected, a history of major depressive disorder, PTSD, and bipolar disorder. (Tr. at 17). When assessing the severity of Claimant's mental impairments, the ALJ considered Claimant's lack of formal mental health treatment; her normal judgment and social skills; her memory and concentration, which Dr. Blair deemed to be adequate; and Claimant's ability to work 20 hours per week, attend a baby shower, clean, make beds, do laundry, and take care of pets.

(*Id.*). Also, the ALJ referenced Dr. Cain's record that Claimant did not have the typical symptoms of bipolar disorder and noted that bipolar disorder was not mentioned elsewhere in Claimant's records. (*Id.*). The ALJ used the special technique to assess Claimant's mental impairments, considering the four broad functional areas known as the "paragraph B" criteria. The ALJ found that Claimant had only mild limitations in activities of daily living; social functioning; and concentration, persistence, or pace; and she had no episodes of decompensation of extended duration. (Tr. at 18). In the first category, the ALJ cited Claimant's activities of daily living such as, *inter alia*, shopping, driving, cooking, and cleaning. (*Id.*). In the second category, the ALJ recounted that Claimant's social skills were normal during her consultative examination and she attended a baby shower. (*Id.*). In the third category, the ALJ noted Claimant's reports of driving, being able to pay attention a lot, and working 20 hours per week. (*Id.*). Ultimately, the ALJ determined that Claimant's mental impairments were non-severe as they did not cause more than minimally vocationally related limitations. (Tr. at 17-18).

Claimant's challenge to the ALJ's step two analysis contends that the ALJ failed to discuss relevant evidence regarding her mental impairments and what little she did discuss, she "cherry pick[ed]" information without accounting for conflicting findings. Claimant's argument undoubtedly focuses only on step two of the ALJ's analysis while discounting all of the ALJ's discussion of the evidence in her subsequent credibility analysis and RFC finding. As stated in the preceding section of this PF & R, the ALJ thoroughly discussed Claimant's treatment records and every piece of opinion evidence, carefully explaining her rationale for the weight that she assigned to the opinions. The ALJ cited that Claimant never received any formal mental health treatment and her mental health allegations did not appear to be consistently present during the twelve-

month period prior to the date last insured. (Tr. at 21). The ALJ also repeatedly discussed the fact that Claimant's activities of daily living indicated that she functioned at a much higher level than she alleged. (Tr. at 23). The ALJ assigned great weight to the opinions of the state agency psychologists who found that Claimant did not have any disabling mental conditions and was only mildly functionally limited due to mental impairments; the ALJ noted that these opinions were supported by the fact that Claimant was treated conservatively with medications from Dr. Cain and never saw a mental health professional. (*Id.*). The ALJ further considered Ms. Spaulding's opinions from her consultative evaluation that Claimant had marked and moderate mental limitations; however, the ALJ ultimately decided to assign Ms. Spaulding's opinions no weight, explaining that the opinions were inconsistent with the other medical evidence. (Tr. at 24). Specifically, the ALJ pointed to the fact that Claimant's treatment records showed that her conditions were under good control with only Celexa prescribed by her primary care physician, her activities of daily living indicated a higher level of functioning than she alleged, and Claimant never pursued any formal mental health treatment or counseling. (*Id.*). The ALJ further stated that she assigned great weight to the testimony of Dr. Blair that Claimant's record did not support a mental limitation or even a psychological diagnosis; again, the ALJ relied on evidence substantiating that Claimant's mental health conditions were controlled by conservative treatment, and she did not pursue counseling or care from a specialist in psychology or psychiatry. (*Id.*).

Although the ALJ did not include all of the above-cited analysis specifically at step two, it is included in her decision and readily allows the court to meaningfully analyze whether her step two decision is supported by substantial evidence. The undersigned finds the ALJ's determination regarding the severity of Claimant's mental impairments

to be well-reasoned, as explained above, and supported by substantial evidence. Claimant's treatment records indicate that Dr. Cain referred Claimant to a counselor for depression in April 2011, although she was noted to be stable psychologically. (Tr. at 459). Later that month, Claimant reported irritability and mood swings; Dr. Cain increased her dosage of Celexa and stated that he would schedule her to see a counselor. (Tr. at 458). However, Claimant never pursued that treatment. Otherwise, during the relevant period, Claimant's treatment record is unremarkable in terms of mental health concerns. The evidence supports the ALJ's assessment that Claimant's treatment was conservative and her psychological complaints were well-controlled.

As far as opinion evidence, Dr. Comer stated in March 2011 that Claimant had non-severe depression related to a general medical condition and only mild functional limitations, including only a mild limitation in maintaining concentration, persistence, or pace. (Tr. at 414, 417, 424). In April 2011, Dr. Boggess affirmed Dr. Comer's assessment. (Tr. at 428). In June 2011, Ms. Spaulding performed a consultative evaluation, which found more severe restrictions. Ms. Spaulding opined that Claimant had severe recurrent major depressive disorder and secondary PTSD, as well as severely impaired recent memory and moderately impaired attention and concentration. (Tr. at 482). Ms. Spaulding assessed that Claimant was moderately impaired in understanding and remembering complex instructions and responding to usual work situations and changes in routine work settings. (Tr. at 484-85). She further found that Claimant was markedly impaired in carrying out complex instructions and making decisions on complex work-related decisions. (Tr. at 484). However, at Claimant's first administrative hearing, Dr. Blair disputed Ms. Spaulding's findings regarding Claimant's memory. Specifically, Dr. Blair testified that Claimant's average scores regarding arithmetic and coding and high

34

average score on the symbol search test indicated that Claimant's short term memory was working "okay." (Tr. at 80). He also disagreed that Claimant's attention and concentration were moderately impaired, and he did not feel that Claimant had PTSD. (Tr. at 82-83). In fact, Dr. Blair did not find any indication of functional operational memory problems, any mental limitations, or even a psychological diagnosis. (Tr. at 83-85). Dr. Blair added that Ms. Spaulding did not provide enough information to establish that the results of her testing were valid. (Tr. at 81).

Notwithstanding the objective evidence, which fails to establish severe mental limitations, there are two sources of evidence—and only two sources—potentially indicating that Claimant had severe mental impairments during the relevant time period: (1) Claimant and (2) Ms. Spaulding. The ALJ carefully considered, compared, and contrasted the statements of both of these sources with the other evidence of record and reconciled the conflicts. First, the ALJ found Claimant to be non-credible for the reasons discussed earlier in this PF&R, and the undersigned found the credibility assessment to be supported by substantial evidence. Second, the ALJ contemplated and ultimately gave no weight to Ms. Spaulding's opinions that Claimant had moderate and marked mental limitations, finding that the opinion of marked limitation, in particular, was disproportionate to the other evidence of record. (Tr. at 24). Further, the ALJ rejected Ms. Spaulding's conclusions on the grounds that Claimant's record indicated that her conditions were under good control with medication, her activities of daily living revealed that she functioned at a higher level than she alleged, and she never pursued any formal mental health treatment. (*Id.*).

The undersigned recognizes that Claimant takes issue with the ALJ's decision to the extent that the ALJ relied on the opinions of Drs. Comer and Boggess, stating that

those non-examining experts did not have the benefit of Ms. Spaulding's subsequent consultative evaluation and were operating under the assumption that Claimant's date last insured was December 31, 2010. The undersigned does not find this argument to be persuasive. The ALJ weighed all of the evidence in this matter, including the opinion evidence. She afforded great weight to the opinions of the non-examining state agency experts, but did not give them controlling or exclusive weight. Furthermore, although Drs. Comer and Boggess did not have the benefit of reviewing Ms. Spaulding's report, Dr. Blair did review it and specifically disagreed with Ms. Spaulding's findings. The ALJ assigned Dr. Blair's opinion great weight on the basis that it was consistent with the evidence. (Tr. at 25). As noted, Dr. Blair opined that Claimant did not have any functional operational memory problems, any mental limitations, or even a psychological diagnosis. (Tr. at 83-85).

Furthermore, the undersigned finds no merit to Claimant's suggestion that Drs. Comer and Boggess's opinions were invalid because they were based upon the incorrect date last insured. The ALJ considered many pieces of evidence through the correct date last insured. The opinions of Drs. Comer and Boggess were only some of the pieces of evidence which the ALJ evaluated regarding Claimant's mental impairments; they were not alone determinative. Additionally, the ALJ found their findings to be consistent with the overall evidence through the correct date last insured. Indeed, other than Ms. Spaulding's report, the record does not contain medical findings relevant to the period between December 31, 2010 and December 31, 2011 that demonstrates any significant change in Claimant's mental health condition. Therefore, it was not error for the ALJ to assign substantial weight to those opinions. *See Hampton v. Colvin*, No. 1:14-CV-24505, 2015 WL 5304294, at *22 (S.D.W. Va. Aug. 17, 2015), *report and recommendation*

36

*adopted,* No. CV 1:14-24505, 2015 WL 5304292 (S.D.W. Va. Sept. 9, 2015) ("[T]the timing of a consultant's opinion is not the critical issue. Whether the consultant's opinion is entitled to weight rests on whether any significant change occurred in the claimant's condition after issuance of the consultant's opinion that reasonably would affect its validity.).

Accordingly, the undersigned **FINDS** that the ALJ's analysis of Claimant's mental impairments is well-reasoned and supported by substantial evidence. The record in this matter fails to establish that Claimant suffered any severe mental conditions or functional limitations. Aside from Ms. Spaulding's single divergent evaluation, Claimant's record of treatment and opinion evidence is largely unremarkable in terms of psychological concerns; rather, her file focuses primarily on Claimant's physical symptoms and conditions. Claimant's record, as well as her activities of daily living, supports the ALJ's finding that her mental impairments were non-severe.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 14); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the

parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  November 3, 2016

Cheryl A. Eifert
United States Magistrate Judge